[Civ. No. 6246. Fourth Dist. Oct. 27, 1961.]

ALECK A. ZIKRATCH et al., Respondents, v. ALBERT C. STILLWELL, Appellant.

Kegley & Read and Carl S. Kegley for Appellant.

Shaw & Barnett, William W. Shaw and Patrick Minor Martin for Respondents.

SHEPARD, J.—This is an appeal from a judgment for damages against defendant real estate broker for alleged secret profits.

### FACTS

The pertinent facts shown by the record before us are substantially as follows: Although there was some dispute as to detail and as to inferences to be drawn, most of the material facts were established without serious conflict.

Plaintiffs owned certain land in Riverside, California. Defendant was a real estate agent (later a broker) working out of the office of a broker named Mathis. Defendant was asked by two businessmen named Adams and Cunnison of Riverside to look for some land as an apartment site, and the three became associated together in the venture. Mathis had previously had a listing on plaintiffs' property. Seeing this, defendant went to plaintiffs and after some disagreement on price, in which plaintiffs asserted a belief that the land was worth $2,000 per acre, secured a listing dated January 29, 1954, for sale of a portion of the property at $1,500 per acre, with provisions for a 5 per cent real estate broker's commission and an option to defendant at the same price. The option portion of the agreement provided for payment or tender of the purchase price on or before August 1, 1954, and that if tender or payment were not made by that date the option would become void and of no effect.

In July, 1954, a Mr. Hanousek of Braemar Construction Corporation (hereinafter called Braemar) discussed certain financing plans for apartment house locations with a flooring contractor named Grubbs. Grubbs later talked this over with Cunnison. September 9, 1954, Hanousek, Cunnison and Adams conferred and discussed the suitability of plaintiffs'

property for Braemar. September 15, 1954, defendant and his associates met with Hanousek on a discussion about the purchase of the property by Braemar. They made a demand of $5,000 per acre for plaintiffs' property and the figure of $3,500 per acre was finally settled upon. September 17, 1954, by letter, Braemar offered $3,500 per acre to defendant and associates for plaintiffs' land which defendant had under option. The fact of these negotiations with Braemar and the offer from Braemar were never communicated to plaintiffs and plaintiffs, during their negotiations for a sale to defendant, knew nothing of them. This vital fact is undisputed.

In the meantime, on July 27, 1954, defendant wrote a letter to plaintiffs stating that the option would be exercised, but he did not accompany the letter by any tender or offer of money of any kind and he named August 2, 1954, as the date that he would meet plaintiffs to sign escrow instructions. He unilaterally opened an escrow with the title company but deposited no money therein. This letter was not received by plaintiffs until July 31, 1954. Thereafter the parties met several times without being able to agree on the exact terms of the sale, nor the exact description or amount of property to be included. It was found necessary to conduct a survey of the land. Defendant's proposed escrow instructions did not follow the provisions of the original option. Finally, the parties met at the title company on September 22, 1954, and plaintiffs, still completely ignorant of the offer from Braemar, signed escrow instructions for sale of the land to defendant and associates at $1,500 per acre and money was deposited by defendant and associates in accordance with escrow instructions. Provision was made in the escrow instructions for payment of a 5 per cent real estate broker's commission to defendant for making the sale, and defendant, through Mathis, was actually paid the commission from the escrow on or about October 18, 1954. October 28, 1954, a new escrow was opened for the sale of the same property by defendant and associates to Braemar at $3,500 per acre. About November, 1954, plaintiffs heard of this sale. Subsequent investigation disclosed to plaintiffs for the first time that defendant had been in possession of an offer from Braemar at $3,500 per acre at the very time he was negotiating the escrow which crystallized September 22, 1954, for sale to himself and associates at $1,500 per acre. This action resulted.

The original complaint took the form of simple assumpsit for money had and received for the use and benefit of plain-

tiffs. Defendant demanded a bill of particulars. Plaintiffs responded that the claim was for "the secret profit obtained by defendant, as real estate agent of plaintiffs, amounting to $2,000 per acre for approximately 12 acres of land, arising out of the resale of said land for $3,500 per acre, after representing value and sale price of said land as $1,500, all of which was known to defendant and unknown to plaintiff at the time of the listing and sale by plaintiff to defendant." The pretrial conference order provided, "This is an action for damages, in which the plaintiffs contend that the defendant, while acting as a real estate broker, in a fiduciary capacity, made secret profits to which the plaintiffs are entitled"; and, "It is stipulated that the plaintiffs paid a commission to Mr. Mathis, for whom Mr. Stillwell was a salesman, and the defendant ultimately received the commission. . . . The issues are:

"(a) Whether or not the defendant was in a fiduciary relationship with the plaintiffs.

"(b) Damages."

After trial the jury returned a verdict for plaintiffs against defendant in the sum of $21,442.84. Defendant moved for a new trial, which was denied. Defendant appeals.

## OPTION AGREEMENT

Defendant contends that the original option agreement, separate and apart from the broker's listing, was the one upon which the sale was consummated September 22, 1954, and that no duty of a fiduciary nature existed between plaintiffs and defendant. With this we are unable to agree. As hereinbefore noted, the option agreement required not only notice of exercise but also a payment or tender of the purchase price on or before August 1, 1954, and that subject option would be void and of no effect unless such payment or tender were so made. Neither payment nor tender were made in accordance with said option. Thus the original option expired completely on August 1, 1954. (*Downer* v. *Buehrle,* 90 Cal.App.2d 719, 721 [2] [203 P.2d 795]; *Callisch* v. *Farnham,* 83 Cal.App.2d 427, 430 [1] [188 P.2d 775]; *Hayward Lbr. & Inv. Co.* v. *Construction Products Corp.,* 117 Cal.App. 2d 221, 227 [2], 229 [9] [255 P.2d 473]; *Transamerica Corp.* v. *Parrington,* 115 Cal.App.2d 346 [4-6] [252 P.2d 385]; *Palmer* v. *Fleming,* 167 Cal.App.2d 108, 111 [3] [334 P.2d 23]; *Fabares* v. *Benjamin,* 180 Cal.App.2d 264, 269 [1] [4 Cal.Rptr. 359].) While tender is not necessary unless the

540

option so provides (*Lawrence* v. *Settle*, 182 Cal.App.2d 386, 389 [5] [6 Cal.Rptr. 49]), in the case here at bar the option would require payment or tender on or before August 1, 1954. Thus, all negotiations conducted after the expiration of the option were on the basis of a new oral promise by plaintiffs.

### AGENT A FIDUCIARY

■■■■■ Appellant next contends that defendant did not act as agent but was acting as a principal at all times. We find no merit in this contention. Defendant cites no evidence that he ever renounced his agency, nor have we found any. Defendant points to a letter which was prepared by himself and which he induced plaintiffs to sign at the time of the escrow on September 22, 1954, in which it is stated that plaintiffs understood that defendant and his associates were acting as principals in negotiating the purchase by themselves. The form of this letter, which is referred to at length by both parties in the briefs on appeal and as to whose contents there appears to be no disagreement, carries no other meaning than that above stated. It appears to mean only that defendant and associates were acting for themselves in making the purchase and were not acting for some undisclosed principal. It nowhere suggests that the brokerage agreement had ever been abandoned nor that defendant was not also observing his fiduciary capacity as agent. There was no reason, if he acted in entire good faith and with full disclosure to plaintiffs, why he could not act both as an agent and as a principal in this transaction. Nothing in the letter is inconsistent with the fact of defendant's continued agency on behalf of plaintiffs. This is borne out by both the testimony of plaintiffs that they continued to consider him their agent looking out for their interests at all times, and the additional fact that defendant provided for and did collect his broker's commission through the very escrow which was entered into at the same time that the letter was signed. Even though the letter had been susceptible of the interpretation placed thereon by defendant, the trial court clearly was not bound by such interpretation in view of defendant's reception of the 5 per cent broker's commission through the escrow and the testimony of plaintiffs above referred to. ■■■■■ The principle that on appeal the facts and reasonable interpretations and inferences drawn therefrom by the trial court must be viewed in the light most favorable to the judgment is too firmly established to require extensive citations. (*Brewer* v. *Simpson*, 53 Cal.2d

567, 583 [1-3] [2 Cal.Rptr. 609, 349 P.2d 289].) ▮▮▮ Under the circumstances, defendant was clearly obligated to disclose fully to plaintiffs all facts within his knowledge that were cogent to the sale and which might influence plaintiffs' willingness to sell. ▮▮▮ As was set forth in *Rattray* v. *Scudder,* 28 Cal.2d 214, 224 [5] [169 P.2d 371, 164 A.L.R. 1356], ". . .'The law does not allow the agent who also has a right to purchase to wait until some one makes an offer of an amount in excess of the agreed purchase price and then elect to purchase the property at the lesser price without informing the owner of the higher offer, and after the agent has obtained the consent from the owner to buy the property, then immediately sell it for the higher price as his own property.' " (See also *Simone* v. *McKee,* 142 Cal.App.2d 307, 312 [3-4] [298 P.2d 667]; *Menzel* v. *Salka,* 179 Cal.App.2d 612, 622 [8-10] [4 Cal.Rptr. 78]; *Kinert* v. *Wright,* 81 Cal.App.2d 919, 925 [6-8] [185 P.2d 364]; *Bell* v. *Scudder,* 78 Cal.App.2d 448, 454 [4-5] [177 P.2d 196].) This basic concept finds firm legislative enactment in Civil Code sections 2228 through 2233.

### Conspiracy

▮▮▮ Defendant next contends that the evidence is insufficient to establish that a conspiracy existed between defendant and his associates. ▮▮▮ Of course the jury was not compelled to believe that a conspiracy existed in order to return the verdict rendered. By the pretrial order, to which no objection was ever made, this became an action for damages. As to the relief sought, the trial court, in the pretrial order, had stated that the issue was "damages" and no objection or motion for change thereof was ever made. (Rule 8.8, Rules for the Superior Courts, 47 Cal.2d, p. 7: "When filed, the pre-trial conference order becomes a part of the record in the case and, where inconsistent with the pleadings, controls the subsequent course of the case unless modified at or before trial to prevent manifest injustice.")

▮▮▮ However, there was ample evidence from which the jury could have concluded that the conspiracy did in fact exist. Cunnison and Adams were businessmen. They knew that Mathis and Stillwell were acting as agents for plaintiffs. They knew as early as July of the possible interest of Braemar. By September they were fully apprised of all the details of that interest and of the flat offer of $3,500 per acre. They were in constant communication with defendant. They collaborated with defendant throughout, in both the negotiations

with plaintiffs and with Braemar. The jury had ample evidence from which to believe that they were fully aware of the complete ignorance of plaintiffs of the Braemar negotiations and offer. The principle that the existence of a conspiracy may "be inferred from the nature of the acts done, the relations of the parties, the interests of the alleged conspirators, and other circumstances," is firmly established in our jurisprudence. (*Greenwood* v. *Mooradian,* 137 Cal.App.2d 532, 538 [3] [290 P.2d 955].)

". . .The trial court is the exclusive judge of the weight of the evidence and the credibility of the witnesses. It is its province to give to the evidence that weight to which, in its judgment, it is entitled, and to draw all reasonable inferences therefrom, . . . The jury may infer the conspiracy from all the circumstances, and if the inference is a reasonable one it will not be disturbed on appeal." (*Campbell* v. *Birch,* 19 Cal.2d 778, 789 [122 P.2d 902].) See also *Biggs* v. *Tourtas,* 92 Cal.App.2d 316, 322 [2] [206 P.2d 871].

 It is of course also well established that deceit may be in the suppression of facts which it is a fiduciary's duty to reveal. (*M. G. Chamberlain & Co.* v. *Simpson,* 173 Cal. App.2d 263, 275 [10-12] [343 P.2d 438].) It is thus clear that there is no merit in this contention.

<h3 style="text-align:center">DEFENDANT'S LIABILITY</h3>

 Defendant next contends that his liability should have been limited to the amount which defendant himself received, citing *Pollak* v. *Staunton,* 210 Cal. 656 [293 P. 26]. Plaintiff suggests that the line of cases in which the rule of the *Pollak* case is approved and cited as authority is limited in its application to money received by or through an agreement or instrument which is illegal because it violates an express mandate of law or public policy. However, it is not necessary to discuss that theory. The rule of the *Pollak* case clearly applies only where the relief sought is on the implied contract to restore money unjustly retained. But this was not the basis of the trial of the action here at bar. As hereinbefore noted, the pretrial order recited that the action was for "damages" and that the "issue" was "damages." As we have likewise already pointed out, under rule 8.8, Rules for the Superior Courts, the pretrial order supersedes the pleading. Nowhere does defendant point out nor have we been able to find anything in the record to show that the theory of damages as the basis of relief was ever abandoned during

trial. Defendant himself, in moving for a nonsuit, used the term ''damages.'' A perusal of the entire record of the trial clearly shows that defendant was at no time under any misapprehension as to the basis of plaintiffs' claim, nor the theory upon which the cause was being tried. Nothing in the record shows that he even suggested to the trial court that he was dissatisfied with or believed the pretrial order should be corrected, and he made no motion for such correction in accordance with requirements of said rule 8.8. (*Kantlehner* v. *Bisceglia,* 102 Cal.App.2d 1, 6 [4-6] [226 P.2d 636].)

Damages connote the character of relief afforded to an injured party for the injury suffered, that is, the amount which will compensate the injured party for all detriment which was proximately caused by the unlawful act of defendant. (Civ. Code, §§ 1709, 3281, 3300, 3333; *Coughlin* v. *Blair,* 41 Cal.2d 587, 600 [16] [262 P.2d 305]; *Gagne* v. *Bertran,* 43 Cal.2d 481, 490 [12] [275 P.2d 15]; *Ojala* v. *Bohlin,* 178 Cal.App.2d 292, 302 [11] [2 Cal.Rptr. 919].)

Thus, in the matter here at bar, what defendant unjustly received is not the criteria, but rather, the criteria is what amount will reasonably compensate plaintiffs for the injury they suffered. If damages are recoverable, the theory adopted by the court and used in the trial of the case will be adhered to by the appellate court. (*Grupe* v. *Glick,* 26 Cal.2d 680, 691 [6] [160 P.2d 832]; *Rutherford* v. *Standard Engineering Corp.,* 88 Cal.App.2d 554, 566 [9] [199 P.2d 354].) In cases of fraud by a fiduciary, the broad rule of Civil Code sections 1709 and 3333 is commonly applied. (*Simone* v. *McKee, supra,* 315 [11].)

Evidence of expenses which plaintiff would have incurred in a direct sale to Braemar was received and evidently considered by the jury, but evidence of that part of the money received by Adams and Cunnison was properly excluded. Defendant caused the damage to plaintiffs. He cannot evade his responsibility in an action tried on the theory of damages by saying that his associates received a part of it. In a damage action we are not concerned with how much the defendant was benefited but rather how much will be needed to compensate plaintiffs for the damage they suffered.

The instructions are not a part of the record. They were originally requested, but on certification of the transcript, no objection was made that the transcript did not contain the instructions. This could not have been an oversight

because defendant did make a motion to correct one or two words of the transcript and he was actively before the court on the subject of transcript correctness. Evidently the question of transcribing instructions was intentionally dropped by consent of defendant. We must assume, under the circumstances, that the jury was properly instructed on the theory of damages. While the defendant, in his original notice, designated the exhibits as a part of the record he did not file any notice with the clerk of the superior court specifying that he desired any of the exhibits transmitted to this court in accordance with rule 10(b), Rules on Appeal. The result is that we have no exhibits before us. However, sufficient reference was made in the testimony contained in the reporter's transcript so as to make clear the substance of their contents.

What we have heretofore said is controlling in respect to any other point raised, and its further discussion is not necessary.

The judgment is affirmed.

Griffin, P. J., concurred.